478 F.3d 224
 UNITED STATES of America, Plaintiff-Appellee,
v.
Calvin Douglas DYESS, a/k/a Rawmel, a/k/a Carlos, a/k/a Calcutta, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Eric Dewayne Spencer, a/k/a High School, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Orange Dyess, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Orange Dyess, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Calvin Douglas Dyess, a/k/a Rawmel, a/k/a Carlos, a/k/a Calcutta, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Eric Dewayne Spencer, a/k/a High School, Defendant-Appellant.
 No. 99-4665.
 No. 99-4666.
 No. 99-4667.
 No. 05-4232.
 No. 05-4233.
 No. 05-4234.
 United States Court of Appeals, Fourth Circuit.
 Argued February 1, 2006.
 Decided February 28, 2007.
 
 ARGUED: Jane Moran, Williamson, West Virginia; Dennis Hugh Curry, Spencer, West Virginia; Joan Arbogast Mooney, Morgantown, West Virginia, for Appellants. Michael James Elston, Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee. ON BRIEF: Paul J. McNulty, Acting United States Attorney, Kimberly R. Pedersen, Special Attorney to the Attorney General, Brian D. Miller, Special Attorney to the Attorney General, Alexandria, Virginia, for Appellee.
 Before WIDENER, NIEMEYER, and GREGORY, Circuit Judges.
 Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge NIEMEYER concurred. Judge GREGORY wrote an opinion dissenting in part and concurring in part.
 WIDENER, Circuit Judge.
 
 I.
 
 1
 This criminal appeal involves the actions by William Hart, a police officer of Charleston, West Virginia, the lead investigator of the drug conspiracy charged in this case, and Ursala Rader Dyess, a defendant in the case who was married to another defendant, Calvin Dyess. Hart's misconduct was first comprised of an affair with Ursala Rader Dyess (later Ursala Hart, now Miss Rader), co-defendant and lead defendant Calvin Dyess's wife;[1] second, Hart's subornation of perjury by Miss Rader at the defendants' sentencing hearing; and third, misappropriation of money taken from the drug-conspiracy and previously turned over to Hart by Miss Rader. More narrowly, this case concerns the appeals by Orange and Calvin Dyess and Eric Spencer of their convictions relating to the drug conspiracy.
 
 
 2
 These events related to the Hart-Ursala affair occurred shortly after the defendants' arrests, around the time of the issuance of the superseding indictment, and continued to go undetected through the defendants' guilty pleas and sentencings. Hart's wrongdoings were not discovered until more than two years later when this case was on appeal for the first time. The government first heard of these activities from Miss Rader herself, and, after conducting an investigation, the Assistant United States Attorney disclosed the misconduct to the defense. In light of the disclosures, we remanded the case without decision for whatever proceedings the district court deemed appropriate.[2]
 
 
 3
 On remand, defendants Calvin Dyess, Orange Dyess, and Eric Spencer requested various forms of relief. First, the defendants moved for an evidentiary hearing to examine the issues raised by the government's disclosures. They also requested, on due process grounds, vacation of the superseding indictment, withdrawal of their guilty pleas, and re-sentencing. Additionally, the defendants argued for resentencing on the basis of the United States Supreme Court's intervening decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).[3] Though the district court granted their motion for an evidentiary hearing, it eventually denied all other relief. We affirm the convictions and sentences.
 
 II.
 
 4
 We begin with a summary of the facts that constitute the basis for the charges, drawing primarily from the 1999 sentencing hearings following the defendants' guilty pleas.[4] For the information concerning Hart's conduct and the unusual procedural history of this case, we refer to several sources: the presentment and report of a grand jury convened to investigate the misconduct; reports and transcripts prepared by the FBI and released through the government's disclosures; and the findings made on remand by the district court following an evidentiary hearing, United States v. Dyess, Criminal Nos. 2:99-00012-01, -03, and -12 (S.D. W. Va. filed Feb. 11, 2005).
 
 
 5
 * * *
 
 
 6
 Sometime in 1996 or 1997, an investigation began into a criminal drug conspiracy in the area of Charleston, West Virginia. The investigation was a cooperative effort between the Charleston Police Department's Metropolitan Drug Enforcement Network Team (Drug Team) and federal Drug Enforcement Administration (DEA) officials. In late-December of 1998, several suspects, including these defendants and Miss Rader, were arrested.[5] On January 22, 1999, an indictment issued charging these and other individuals with various drug and money-laundering crimes. Less than a month later, a grand jury handed down a superseding indictment consisting of substantially the same charges.
 
 
 7
 Ultimately, Calvin Dyess was indicted for the following: 1) engaging in a continuing criminal enterprise involving the distribution of cocaine, crack, and marijuana in violation of 21 U.S.C. § 848 (Count One); 2) conspiring to distribute and possess with intention to distribute cocaine, crack, and marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count Two); 3) conspiring to launder the proceeds of such drug sales in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and (h) (Count Three); 4) traveling in interstate commerce to promote or carry on the drug distribution enterprise in violation of 18 U.S.C. § 1952(a)(2) and (3) (Count Four); 5) distributing controlled substances in violation of 21 U.S.C. § 841(a)(1) (Counts Five, Seven, Eight, and Eleven); 6) possessing a cell phone modified to obtain unauthorized telecommunications services in violation of 18 U.S.C. § 1029(a)(7) (Count Six); and 7) possessing a firearm as a felon in violation of 18 U.S.C. § 922(g)(1) (Count Nine). Defendant Spencer was also charged with involvement in the drug conspiracy (Count Two), travel in interstate commerce to facilitate the conspiracy (Count Four), and possession of crack, cocaine, and marijuana with intent to distribute (Count Eight). The indictment additionally charged Orange Dyess with participating in the drug conspiracy.
 
 
 8
 In December of 1998 and January of 1999, law enforcement obtained the cooperation of several key indicted individuals, including Miss Rader (then Mrs. Dyess). On January 14, 1999, Miss Rader tendered about $260,000 of Calvin Dyess's drug proceeds to the government.
 
 
 9
 On February 2, 1999, Miss Rader notified Hart that she had recovered more drug money and was prepared to surrender it to law enforcement. Although Miss Rader later stated that, on this occasion, she recovered and turned over about $80,000, Hart only submitted $41,630 to the Drug Team's forfeiture officer. Miss Rader admitted that Hart allowed her to keep about $20,000 to $27,000 out of the second recovered sum.[6]
 
 
 10
 Hart's improper gift of money to Miss Rader presaged their affair. According to Miss Rader, Hart soon initiated overtly romantic contact by calling her regularly and bringing gifts to her and her young daughter. On occasions when Miss Rader expressed fear about testifying against Calvin Dyess, Hart assured her that "he would make sure [Calvin] would never get out and hurt" her. By March of 1999, Miss Rader considered she and Hart to be "in a relationship."
 
 
 11
 The district court set trial for Miss Rader, Calvin Dyess, Spencer, and Orange Dyess for April 27, 1999. However, on March 30, 1999, Miss Rader pleaded guilty to one charge of money laundering under 18 U.S.C. § 1956(a)(1)(B)(I) (Count Three). On April 21, Calvin Dyess tendered a guilty plea to two charges: conspiring to sell drugs in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count Two) and laundering those proceeds as defined by 18 U.S.C. § 1956(a)(1)(B)(i)(Count Three). Spencer also pleaded guilty on the same day to the drug conspiracy count of 21 U.S.C. §§ 841(a)(1) and 846. On April 28, 1999, shortly before a jury was to be impaneled, Orange Dyess likewise entered a guilty plea to an information of a single charge of maintaining a place for the purpose of distributing and using cocaine, crack cocaine, and marijuana (a crack house), in violation of 21 U.S.C. § 856.
 
 
 12
 Presentence investigation reports were prepared as to each defendant prior to the sentencing hearings. Calvin Dyess's report details his activities in the drug conspiracy, as well as his subsequent attempts to launder the profits. The total quantity of drugs directly attributed to Calvin Dyess is listed as 20 kilograms of cocaine, 80 kilograms of cocaine base, and 272.16 kilograms of marijuana. The authoring probation officer recommended upward sentencing adjustments pursuant to § 3B1.1(a) of the 1998 version of the United States Sentencing Guidelines (U.S.S.G.) based on his leadership role in a conspiracy involving five or more persons, as well as enhancements under § 3C1.1 for his attempts to impede the government's investigation and prosecution after his arrest,[7] and under § 2D1.1(b)(1) for the presence of firearms during the offense.[8] Based on this conduct, the report recommended a life sentence for the drug conspiracy charge and a maximum of 20 years for the money laundering offense. The report did not recommend that Calvin Dyess's offenses be grouped under U.S.S.G. §§ 3D1.1 and 3D1.2.
 
 
 13
 Calvin Dyess objected to the factual bases for the upward sentencing adjustments. He disclaimed a managerial role in the conspiracy, maintaining that all participants were equal partners with none having authority over the other. An objection was also made to the probation officer's failure to group the sentences.
 
 
 14
 Additionally, Calvin Dyess disputed the report's appraisal of the drug amounts and pointed to the testimony of grand jury witnesses who offered varying estimates of the quantity of each substance involved. In a contemporaneous amended proffer to the government, however, Calvin Dyess admitted to purchasing and distributing the following totals: 12 to 17 kg of cocaine, a hundred pounds of marijuana, and 18 to 20 ounces of crack cocaine.
 
 
 15
 As to Spencer, the presentence report outlines his participation in trips to other States for the purpose of purchasing "kilogram quantities of cocaine, cocaine base, and marijuana." The report also notes the government's intention to offer evidence demonstrating that "a total of at least 1.5 kilograms of cocaine base and 272.12 kilograms of marijuana can be attributed to [Spencer]." After accounting for an upward sentencing adjustment due to Spencer's managerial or supervisory role in the conspiracy, the report finds that Spencer is eligible for a life sentence, with a mandatory minimum of ten years incarceration. Spencer objected to the recommendation of an upward sentencing adjustment, maintaining that Spencer's involvement in the conspiracy was limited to "routine mundane activity."
 
 
 16
 The probation officer who prepared Orange Dyess's presentence report described "large scale distribution and use of illegal substances" occurring at the defendant's residence. The report attributed 882.72 grams of cocaine base, 100 grams of cocaine, and 2.26 grams of marijuana to Orange Dyess. The report outlines a statutory maximum term of imprisonment of 20 years, with an applicable guideline range of 235 to 293 months. Orange Dyess formally objected to the probation officer's reliance on certain witnesses in preparing his report, but did not otherwise dispute the drug quantities attributed to him.
 
 
 17
 The district court held a sentencing hearing for the three defendants (Calvin and Orange Dyess and Spencer) on August 25 and 26, 1999. A total of 13 individuals testified at these hearings, including Miss Rader. Miss Rader described in general terms Calvin Dyess's drug activities. In addition, she discussed turning over drug money to the police shortly after her arrest but did not disclose that Hart had permitted her to retain a portion of the money.
 
 
 18
 On direct examination, Miss Rader described an instance where she saw Calvin Dyess attempting to convert cocaine into crack on a stove top in an apartment. The government presented a demonstrative exhibit, supposedly made by Miss Rader, that purported to indicate how much cocaine powder Miss Rader observed in a saucepan. Miss Rader testified to another occurrence where she witnessed Calvin Dyess handling drugs at a co-conspirator's apartment where he was fanning a cookie sheet containing crack cocaine, with a large quantity of cocaine simultaneously sitting on the kitchen counter. Two other demonstrative exhibits were also submitted to illustrate the drug amounts Miss Rader observed on this occasion; these exhibits were, again, supposedly made by Miss Rader herself.
 
 
 19
 Other co-conspirators testified at the sentencing hearings: Lance Williams, Eddie Ray Dyess, Douglas Miles, Philip Weldon, Leon Mitchell, and Benjamin Green. These witnesses verified the information in the presentence report and described specific drug sales by Calvin Dyess, as well as details of his management of the drug conspiracy. They also testified to Calvin Dyess's money and drug dealings with Orange Dyess, the storage, sale, and consumption of drugs at Orange Dyess's residence, drug trips orchestrated by Calvin Dyess and Spencer, and occasions that Calvin Dyess was observed converting cocaine powder into crack. Williams estimated that Calvin Dyess transported between 40 and 60 kilograms of cocaine into Charleston. Mitchell also ventured that Calvin Dyess transported into Charleston between 75 and 100 kg of cocaine powder, with over half of the sum total being converted into crack cocaine, and approximately a hundred to two hundred pounds of marijuana. Officers Hart and Henderson served as witnesses for the government as well.
 
 
 20
 At the conclusion of the sentencing hearing, the district court sentenced the defendants. As to Calvin Dyess, the court concluded the base offense level for the drug conspiracy charge to be 38. (J.A. 755) Sentencing enhancements were applied according to the guidelines as follows: two levels for the presence of firearms under U.S.S.G. § 2D1.1(b)(1); two levels for obstruction of justice according to U.S.S.G. § 3C1.1; four levels for occupying a managerial or supervisory role in the commission of the offense provided by U.S.S.G. § 3B1.1(a). As Calvin Dyess's prior convictions placed him in a criminal history category of III, the applicable guideline range for the conspiracy offense was mandatory life imprisonment with a fine ranging from $25,000 to $4 million. (J.A. 755-56) Accordingly, Calvin Dyess received a life sentence and a $25,000 fine. (J.A. 757) For the money laundering count, the court sentenced Calvin Dyess in a supplemental judgment to a concurrent term of 108 months incarceration. (J.A. 769)
 
 
 21
 Spencer's base offense level for the conspiracy charge was also 38. (J.A. 730) Although Spencer received a three-level enhancement for his elevated role in the commission of the offense, the court simultaneously granted him a three-level reduction for acceptance of responsibility. (J.A. 726, 730) With a criminal history category of II, the applicable sentencing range was 262 to 327 months imprisonment, followed by a period of supervised release and a fine of $25,000 to $4 million. (J.A. 730-31) Ultimately, the court sentenced Spencer to 262 months of incarceration, with five years of supervised release, and a $10,000 fine. (J.A. 738)
 
 
 22
 With respect to Orange Dyess, the district court found his base offense level to be 36. (J.A. 709) A two-level enhancement was applied due to the presence of firearms at his residence (J.A. 709). With a criminal history category of I, the sentencing guidelines prescribed a punishment of 235 to 293 months, a fine ranging from $25,000 to $500,000, and a three year term of supervised release. (J.A. 710) However, 21 U.S.C. § 856(b) provides a twenty year maximum for convictions of this offense, so the court sentenced Orange Dyess at the lower range of the guidelines, with 235 months of imprisonment followed by a supervised release term of three years. (J.A. 714)
 
 
 23
 Defendants separately filed timely notices of appeal (J.A. 787, 789, 790), and we consolidated the appeals. (J.A. 83)
 
 
 24
 On April 29, 2002, ten days before scheduled oral argument in this court, the government issued the first of several disclosures to the defendants in compliance with the Supreme Court's holdings in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). (S.J.A.14) In light of the new information, this court remanded the case to the district court, directing it to "conduct such further proceedings as it may deem appropriate." United States v. Dyess, Nos. 99-4566, 99-4665, 99-4666, 99-4667 (4th Cir. Aug.28, 2002) (Remand Order). (S.J.A.18)
 
 
 25
 The reports following the government investigation detailed Hart's amatory adventures and his gift of drug money proceeds to Miss Rader, which we have already mentioned supra. The disclosures also described Hart's subornation of perjury at the sentencing hearing by influencing and constructing Miss Rader's testimony.[9] Miss Rader also admitted that she did not make the demonstrative exhibits used by the government in the sentencing hearing and that, in truth, she could not say with certainty that the exhibits accurately represented the amount of drugs she had seen. (S.J.A.60F, 424-25)
 
 
 26
 To further complicate matters, in May and June of 2002, Calvin Dyess prepared false affidavits on behalf of co-conspirators Benjamin Green, Lori Cummings, and Eddie Ray Dyess. (S.J.A.183-84, 208-09, 212-14, 430-31) Benjamin Green and Eddie Ray Dyess were witnesses for the government at the defendants' sentencing hearing. (J.A. 431, 576) Benjamin Green had also given testimony before the grand jury that issued the superseding indictment in 1999. (S.J.A.421, 425) Miss Cummings was also examined by the 1999 grand jury, though she was not a government witness at the sentencing phase. (S.J.A.421) Calvin Dyess requested Green, Miss Cummings, and Eddie Ray Dyess to sign these affidavits with the intention of submitting them to the court. (S.J.A.183-84, 208, 430-31) Eddie Ray Dyess refused to sign the affidavit prepared for him and instead turned the document over to his probation officer. (S.J.A.430-31) Green and Miss Cummings chose to sign the affidavits that claimed each had committed perjury at the insistence of Hart during the defendants' proceedings. (S.J.A.60J-L, 180-82)
 
 
 27
 In his affidavit, Green disavowed any knowledge of specific drug quantities attributable to Calvin Dyess's conspiracy activities. (S.J.A.60K) Green claimed that Hart coerced him to giving false testimony at the sentencing hearing as to Calvin Dyess's transportation of multiple kilograms of cocaine. (S.J.A.60K) Similarly, Miss Cummings' affidavit describes threats by Hart that forced her to fabricate testimony regarding her assistance to Calvin Dyess in bringing back drugs from New York to Charleston. (S.J.A.181-82)
 
 
 28
 On remand, the defendants first moved to disqualify the United States Attorney's Office for the Southern District of West Virginia from further participation in the case. The district court (Judge Haden) granted the motion,[10] and in January of 2003, three Special Assistants to the Attorney General took over the case for the government.
 
 
 29
 On July 9, 2003, the defendants made several other motions. Calvin Dyess and Spencer moved to vacate their sentences based on the Supreme Court's recent decision in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In addition, all of the defendants moved for dismissal of the indictment based on government misconduct, withdrawal of their guilty pleas, and a new sentencing hearing. The defendants also moved for a separate evidentiary hearing for the presentment of proof raised by the government's disclosures. On December 17, 2003, the district court (Judge Haden) granted the defendants' request for an evidentiary hearing and deferred a decision on the question of resentencing and Apprendi's impact until after the hearing. The court, at that time, denied all of the defendants' other motions.
 
 
 30
 On August 26, 2003, a federal grand jury had been empaneled to review the evidence with respect to the investigation of the drug trafficking activities of Calvin Dyess and others. The grand jury also investigated the factual bases for Miss Rader's allegations of Hart's misconduct and made findings as to the impact of Hart's actions on the integrity of the proceedings. The grand jury's presentment and report of May 4, 2004 detailed Hart's behavior as outlined above, but concluded that the grand jury had "discovered nothing that undermines our confidence in . . . [the defendants'] guilt or in the sentences imposed."[11] (S.J.A.437) Additionally, the grand jury reviewed evidence regarding the false affidavits filed by Benjamin Green and Lori Cummings in May and June of 2002. In April and May of 2004, both Green and Miss Cummings recanted the allegations contained in the affidavits,[12] they named Calvin Dyess as the affidavits' author, and testified that Calvin Dyess instructed Green and Miss Cummings to sign them.
 
 
 31
 The evidentiary hearing ordered by Judge Haden December 17, 2003 was held by Judge Faber on July 9, 2004.[13] Prior to the hearing, the court entered an order on June 18, 2004, which noted that the defendants' motion for resentencing was still outstanding. The court found that the defendants, as the motion's proponents, should bear the burden, during the remand proceedings, of demonstrating the unreliability of the Calvin Dyess, Spencer, and Orange Dyess's sentences.
 
 
 32
 At the hearing before the district court, the defendants and the government examined witnesses,[14] including Miss Rader, and submitted evidence regarding the facts that justified the defendants' sentences. Miss Rader admitted before the court that some of her original testimony was orchestrated by Hart and that he showed her statements of other witnesses to ensure consistency. Miss Rader also testified that Hart had prepared the demonstrative exhibits used by the government at sentencing. Throughout the hearing, the government did not contest the defendants' position that Miss Rader's prior testimony should no longer be credited. Instead, the government asserted that it had presented sufficient evidence at the initial sentencing hearing to support the court's judgments, apart from Miss Rader's testimony. The defendants did not offer any evidence to suggest that the accounts of drug amounts by other witnesses at the sentencing hearing were affected by Hart's misconduct.
 
 
 33
 On February 11, 2005, the district court (Judge Faber) entered its final order denying the defendants' motion for resentencing. The court acknowledged the existence of Hart and Miss Rader's relationship and the unreliability of her testimony. It concluded nonetheless that "the drug quantities established by other witnesses who testified at the defendants' consolidated sentencing hearing significantly exceed the 1.5 kilograms of crack cocaine" which served as the grounds for the sentences. Furthermore, the court pointed out that defendants Spencer and Orange Dyess did not contest the drug amounts that were attributed to them in the proceedings prior or following the sentencing hearing. As to the impact of United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), on the defendants, the court explicitly noted that if it were "called upon to resentence these defendants, [it] would give them the same sentences" previously imposed.
 
 
 34
 Each defendant filed a notice of appeal from the final order: Calvin Dyess on February 21; Orange Dyess on February 22; and Spencer on February 28.
 
 III.
 
 35
 Before considering the merits of this appeal, we first address our jurisdiction. Congress has authorized us to hear the defendants' appeal from the district court's final order pursuant to 28 U.S.C. § 1291.
 
 
 36
 The government suggests in an offhand way that Spencer's claims are not properly before us because his notice of appeal is untimely. (Compare br. p. 2 with br. p. 3.) Spencer's notice of appeal was filed February 28, 2005 (S.J.A.408-09), while the district court's final order was entered on February 11, 2005. (S.J.A.380) A criminal defendant has ten days following a district court's final order to file notice of appeal. Fed. R.App. P. 4(b)(1)(A). In computing a period of time under the rules, we are directed to "exclude the day of the act, event, or default that begins the period," as well as any "intermediate Saturdays, Sundays, and legal holidays when the period is less than 11 days." Fed. R.App. P. 26(a)(1) and (2). According to this computation, therefore, the government's calculations are incorrect. Spencer's notice was filed seventeen calendar days after the final order; however, six of those days were weekends, and one was a federal holiday as defined by Fed. R.App. P. 26(a)(4), i.e., Washington's Birthday. Since Spencer's notice of appeal was filed in compliance with the time limitations of Fed. R.App. P. 4(b)(1)(A), his appeal was timely taken.
 
 IV.
 
 37
 In this factually complicated and unusual case, it is of considerable consequence to note that at the time Judge Faber entered the order appealed from in this case, on February 11, 2005, he had at hand for consideration all of the facts mentioned in this opinion, except with respect to the grand jury empaneled August 26, 2003. With respect to the grand jury, he had apparently considered only the testimony of the witnesses Rader, Henderson, and Hart. Judge Faber did have before him all of the facts before Judge Haden at the time Judge Haden entered his orders which may be at issue in this case.
 
 V.
 A.
 
 38
 The defendants urge us to reverse the district court's denial of their motion to dismiss the indictment and the information and to bar reprosecution of the charges. The defendants claim that Hart's actions constituted outrageous government conduct that undermined the defendants' right to fundamental fairness and due process in the criminal proceedings. Since the presence of prosecutorial misconduct is a factual inquiry, we review the district court's findings on that issue for clear error. United States v. McDonald, 61 F.3d 248, 253 (4th Cir.1995), not followed on unrelated grounds by United States v. Wilson, 205 F.3d 720 (4th Cir.2000).
 
 B.
 
 39
 This court has previously acknowledged that egregious government conduct may violate due process and prevent the reprosecution of a defendant. See United States v. Jones, 18 F.3d 1145, 1154 (4th Cir.1994) (citing United States v. Goodwin, 854 F.2d 33, 36-37 (4th Cir.1988)). To constitute a due process violation, the government's actions must be "so outrageous as to shock the conscience of the court." United States v. Osborne, 935 F.2d 32, 36 (4th Cir.1991). We have therefore emphasized that these claims will be recognized only in "rare cases." Jones, 18 F.3d at 1154.
 
 
 40
 The conduct alleged to be outrageous here is Hart's romantic involvement with Miss Rader during the plea and sentencing phases of the defendants' proceedings and his subornation of perjury by Miss Rader at the sentencing hearing. We address Hart's wrongdoings in turn to determine whether his actions meet the threshold set out in Osborne.
 
 1.
 
 41
 Hart and Miss Rader's relationship was clearly improper. We agree with the district court, however, that it did not rise to the level of outrageous misconduct sufficient to warrant dismissal of the defendants' charges with prejudice.
 
 
 42
 Although this court has not yet had occasion to establish a standard for evaluating a due process claim based on sexual misconduct by a government agent, other circuits have. In United States v. Cuervelo, 949 F.2d 559 (2d Cir.1991), the Second Circuit ruled on the necessity of an evidentiary hearing based on a claim by the defendant that the investigating agent tried to establish a "love interest" with her. Cuervelo, 949 F.2d at 561. Specifically, the male DEA agent had sexual relations with the female defendant on several occasions, wrote her love letters, and brought her gifts of money, clothes, and jewelry. Cuervelo, 949 F.2d at 563. On appeal, following a jury trial and conviction, the Second Circuit held that an evidentiary hearing must be held to determine if a violation of due process has occurred once a defendant demonstrates the following:
 
 
 43
 (1) that the government consciously set out to use sex as a weapon in its investigatory arsenal, or acquiesced in such conduct for its own purposes upon learning that such a relationship existed; (2) that the government agent initiated a sexual relationship, or allowed it to continue to exist, to achieve governmental ends; and (3) that the sexual relationship took place during or close to the period covered by the indictment and was entwined with the events charged therein.
 
 
 44
 Cuervelo, 949 F.2d at 567. The appellate court did not reach the merits of the defendant's due process claims in Cuervelo; instead, it remanded the matter to the district court for findings of fact to determine whether the DEA agent's conduct was sufficiently outrageous to constitute a due process violation. 949 F.2d at 569.
 
 
 45
 In United States v. Nolan-Cooper, 155 F.3d 221 (3d Cir.1998), the Third Circuit applied the Cuervelo test to a case involving a sexual relationship between a defendant and an undercover officer. The Third Circuit made a slight modification to the Cuervelo standard, however, finding that a female defendant met her burden by showing that the authorities "knew or should have known" of the existence of the sexual relationship. Nolan-Cooper, 155 F.3d at 233. The facts before the Third Circuit also involved a female defendant who was the target of romantic overtures by the male investigating agent. Nolan-Cooper, 155 F.3d at 226. The contact between the two parties ultimately resulted in a sexual encounter. Nolan-Cooper, 155 F.3d at 234. The court found that this intimate exchange was not orchestrated by the government to serve any investigatory ends and, as a result, held that it did not give rise to a due process violation on the basis of outrageous government conduct. Nolan-Cooper, 155 F.3d at 234.
 
 
 46
 Cuervelo and Nolan-Cooper are admittedly distinct from the present case in that none of the defendants presently before us in this appeal was the direct object of Hart's sexual overtures; nonetheless, we find the test adopted by the Second and Third Circuits to be a useful framework within which to examine Hart's actions.
 
 
 47
 In addressing the first and second Cuervelo factors, we note that the defendants do not now allege, and did not allege in the district court, that Hart engaged in a relationship with Miss Rader for government purposes or to achieve investigatory advantages. Hart's behavior was to reassure Miss Rader that nothing bad would happen to her, and gifts to her and her daughter were aimed at endearing Miss Rader to Hart and not at obtaining more information to aid in the defendants' prosecution. The district court found that Hart "sought to satisfy personal needs, personal desires and personal ends by his sexual and, ultimately, short-term marital relationship with Ursala." "These were personal, not governmental goals." (S.J.A.120) In light of the record, we are of opinion that the district court's factual findings on this point are not clearly erroneous.
 
 
 48
 As to the third Cuervelo factor, the district court found that Hart's relationship with Miss Rader began as early as February of 1999, near the issuance of the superseding indictment. (S.J.A.128-P) By all accounts, however, the relationship did not take place "during or close to the period covered by the indictment" i.e., between 1995 and December of 1998. Cuervelo, 949 F.2d at 567 (emphasis added). More importantly, there is no evidence that the affair was "entwined with the events" described in the charging instruments: the drug conspiracy and money laundering activities. Cuervelo, 949 F.2d at 567. Unlike the defendants in Cuervelo and Nolan-Cooper, who were the objects of ongoing investigations at the time of the sexual encounters, these defendants stood accused and detained by the government at the time of Hart and Miss Rader's coupling. Because Hart's misbehavior had not yet occurred at the time of the defendants' arrests, his conduct neither improperly enticed the defendants into engaging in the charged criminal activity nor invited another to reveal information which led to the charges. See Nolan-Cooper, 155 F.3d at 234 ("The Cuervelo framework contemplates conduct that is designed to achieve investigatory or other government ends; failing this, the case cannot support [defendant's] claim.") Therefore, Hart's relationship with Miss Rader cannot be said to be sufficiently outrageous as to warrant dismissal with prejudice of the indictment or the information and we affirm the order of the district court in this respect.
 
 2.
 
 49
 It is also undisputed that Hart induced Miss Rader to commit perjury at the sentencing hearing, both as to the amount of drugs she personally observed and the creation of the demonstrative exhibits. However, we agree with the district court that a dismissal of the indictment and the information is not an appropriate remedy for this misconduct.
 
 
 50
 In United States v. Derrick, 163 F.3d 799 (4th Cir.1998), this court addressed a defendant's contention that his indictment should be dismissed on the basis of discovery violations by the government. Derrick, 163 F.3d at 803. We emphasized that "an indictment may not be dismissed for prosecutorial misconduct absent a showing that the misconduct prejudiced the defendant." Derrick, 163 F.3d at 807. Furthermore, even when a court finds such prejudice, dismissal of the indictment does not necessarily follow as a remedy. Retrial, for example, may fully cure prejudice. Derrick, 163 F.3d at 809. See also Derrick, 163 F.3d at 807 ("The dismissal of an indictment altogether clearly thwarts the public's interest in the enforcement of its criminal laws . . . .") We therefore affirm the district court's denial of the defendants' motion to dismiss with prejudice the indictment and information.
 
 VI.
 
 51
 Defendants Calvin Dyess and Orange Dyess argue that the district court erred in denying a motion to withdraw their guilty pleas.[15] Both defendants contend that their pleas were not knowing and voluntary, and Calvin Dyess claims that we should permit withdrawal based on the government's purported breach of the plea agreement. We review a district court's denial of a motion to withdraw a guilty plea for abuse of discretion. United States v. Craig, 985 F.2d 175, 178 (4th Cir.1993). We affirm.
 
 A.
 
 52
 When a defendant enters a plea of guilty and later seeks to withdraw it, the defendant bears the burden of demonstrating that withdrawal should be granted. See United States v. Moore, 931 F.2d 245, 248 (4th Cir.1991). Calvin Dyess and Orange Dyess are making a post-sentencing challenge to their guilty pleas. In these situations, a district court only abuses its discretion in denying withdrawal if the underlying plea proceedings "were marred by a fundamental defect that inherently resulted in a complete miscarriage of justice, or in omissions inconsistent with rudimentary demands of fair procedure." United States v. Ubakanma, 215 F.3d 421, 425 (4th Cir.2000). We review each of the defendants' due process challenges in turn.
 
 1.
 
 53
 Calvin Dyess argues that his guilty plea violates due process because it was not knowing or voluntary. He claims that his attorney's decision to allow him to enter into a plea agreement that included exposure to a life sentence amounts to ineffective assistance of counsel. Calvin Dyess also faults his attorney for not knowing about Hart and Miss Rader's intimate relation and the degree to which it would affect the sentencing process.
 
 
 54
 We agree with the district court that Calvin Dyess had the benefit of competent counsel at the time of the proceedings and that his plea was therefore knowing and voluntary. To justify a withdrawal of a guilty plea on the basis of ineffective assistance of counsel, a defendant must show 1) that his counsel's actions fell below an objectively reasonable standard, and 2) that but for the attorney's errors, it is reasonably probable that the defendant would have chosen to face trial rather than plead guilty. Ubakanma, 215 F.3d at 425; United States v. DeFreitas, 865 F.2d 80, 82 (4th Cir.1989). Calvin Dyess fails to meet this burden.
 
 
 55
 Calvin Dyess cannot successfully claim that he was ineffectively represented solely because his attorney allowed him to accept a guilty plea that included exposure to a life sentence. The defendant was charged with twelve federal counts involving drug distribution, money laundering, firearm possession, and unauthorized use of a cell phone. In exchange for pleading guilty, the government agreed to dismiss ten of these charges. During the plea colloquy, Calvin Dyess admitted to the factual elements of the two remaining counts. (S.J.A.128U) The defendant was advised of the applicable sentencing range, both in the written plea agreement (J.A. 135) and during the plea colloquy (S.J.A.128U). By signing the plea agreement and in responding in the same fashion to the district court's questions at the hearing, Calvin Dyess acknowledged understanding that a specific sentence, ranging anywhere from ten years to life imprisonment, would be determined at a date subsequent to the plea. (J.A. 136-37, 140; S.J.A. 128U-V) Calvin Dyess exercised his own choice to plead guilty and expressly accepted the risk of the uncertainty of his sentence, including the possibility of serving a life sentence. The defendant may not now fault his attorney for an outcome that is the product of his own decision-making.
 
 
 56
 Likewise, we are not persuaded by Calvin Dyess's contentions that his attorney rendered ineffective assistance by failing to uncover Hart and Miss Rader's love affair and anticipate the impact it would have at sentencing. Even the federal prosecutors closely associated with the case also had no knowledge of the affair until Miss Rader's revelation in late-2001. (S.J.A.116-17) Calvin Dyess offers no indication as to why his attorney should be expected to have some special knowledge of the situation, and we find none in the record.
 
 
 57
 In addressing ineffective assistance of counsel challenges, this court presumes that the defendant's counsel rendered objectively effective performance. See Matthews v. Evatt, 105 F.3d 907, 919 (4th Cir.1997). Calvin Dyess has failed to overcome this presumption. Since the defendant cannot show that his attorney's conduct leading up to and during the guilty plea was objectively unreasonable, we conclude that he pleaded guilty knowingly and voluntarily. We do not address whether Calvin Dyess would have chosen to be tried on the charges absent his guilty plea because we have concluded that the guilty plea was not effected by attorney error. As such, we are of opinion and hold that the district court did not abuse its discretion in denying Calvin Dyess's motion to withdraw his plea.
 
 2.
 
 58
 Orange Dyess also argues that his plea was not knowing and voluntary in violation of due process. Specifically, the defendant states that his attorney did not meaningfully advise him of the nature of the offense to which he was pleading. As evidence of his counsel's ineffectiveness, Orange Dyess claims that he expressed confusion as to the elements of the charge during the colloquy.
 
 
 59
 As with Calvin Dyess's ineffective assistance of counsel challenge, we evaluate the conduct of Orange Dyess's attorney as a basis for withdrawal of the plea under the Ubakanma standard. Ubakanma, 215 F.3d at 425. The performance of Orange Dyess's counsel before and during the plea hearing meets this objectively reasonable threshold. During the plea colloquy, the defendant affirmed that he and his attorney had already reviewed the written plea agreement together. (J.A. 274) Later in the hearing, the court also inquired as to whether the defendant was satisfied with his counsel's performance:
 
 
 60
 Q. Do you feel now that you have had adequate time to fully discuss all aspects of your case with [your attorney] before reaching [the] decision [to plead guilty]?
 
 
 61
 A. Yes.
 
 
 62
 Q. And has he been able to answer the questions you have had about the best way for you to proceed under the circumstances?
 
 
 63
 A. Yes.
 
 
 64
 Q. Are you satisfied with the quality of his legal service to this point in time, knowing that he is representing you in a serious criminal matter?
 
 A. Yes. (J.A. 287-88)
 
 65
 In contrast to these declarations, the defendant points to a portion of the plea hearing transcript as evidence that his attorney did not properly explain the nature of the offense to which he was pleading: Q. What [Assistant United States Attorney Monica Schwartz] is suggesting to you is that this is — you are charged with operating a crack house and —
 
 
 66
 A. No, sir. Excuse me. She didn't tell me was operating knowingly, that someone was smoking in my house. She didn't tell me it was operating a crack cocaine house.
 
 
 67
 Defense counsel: Your Honor, when I — when I read that to you [Orange], you raised the question about the sentence "opening or maintaining."
 
 
 68
 Orange Dyess: Right.
 
 
 69
 Defense counsel: And I indicated to you, you maintained that house.
 
 
 70
 Orange Dyess: Well, I lived there. I resided there.
 
 
 71
 Defense counsel: You lived there, so that is — that's the context of which that particular phrase was explained to Mr. Dyess. (J.A. 275)
 
 
 72
 This exchange evidences that the defendant's attorney previously discussed the definition of the charge with his client. Taken in context, Orange Dyess's objections were to the district court's use of the phrase "operating a crack house" rather than a disagreement over the facts necessary to establish an element of the crime, that the defendant knowingly permitted others to use crack in his home. These statements, however, do not translate into a finding that his attorney failed to adequately advise him of the nature of the pending charge.[16] The determination of the sufficiency of an attorney's performance is an objective one. So long as the attorney's explanation of the charge was appropriately calculated, as here, to apprise a defendant in Orange Dyess's situation of the accusations he faced, the reasonableness standard is met. Furthermore, the defendant expressed satisfaction with his attorney during the colloquy; this statement of fact cannot be so easily repudiated. See United States v. Lambey, 974 F.2d 1389, 1395 (4th Cir.1992). Orange Dyess has failed to carry his burden under Ubakanma; we therefore find and hold that the district court properly exercised its discretion in denying Orange Dyess's request to withdraw his guilty plea based on the due process grounds of ineffective assistance of counsel.
 
 B.
 
 73
 As additional grounds for withdrawing his guilty plea, Calvin Dyess argues that the government failed to offer him a meaningful debriefing, thereby breaching the plea agreement. On remand, the district court found that the government had not violated the plea agreement except in one particular, and we agree with that finding and with its reasoning. The one defect was that the government did not offer Calvin Dyess an opportunity to cooperate by debriefing. It held that the debriefing would be required if Calvin Dyess were to be resentenced following the evidentiary hearing. We affirm the conviction and sentence of Calvin Dyess, however, so neither resentencing or debriefing is required. We do not further consider the debriefing question.
 
 VII.
 A.
 
 74
 Each of the defendants also claims that his sentence is unconstitutional in light of the Supreme Court's holdings in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). They contend that the district court made findings of fact at the sentencing hearing apart from those already admitted by the defendants. They argue that the court used these findings to enhance their sentences beyond the original guideline range in contravention of the Sixth Amendment. See Booker, 543 U.S. at 245, 125 S.Ct. 738; United States v. Hughes, 401 F.3d 540, 546 (4th Cir.2005).
 
 1.
 
 75
 We are obliged to consider the defendants' challenges under Booker, even though their sentences were imposed several years prior to that decision. The defendants' sentences are before this court on direct appeal following a remand order without decision. Booker, 543 U.S. at 268, 125 S.Ct. 738 (holdings to be applied "to all cases on direct review").
 
 2.
 
 76
 Sixth Amendment sentencing error occurs when a sentencing court under a mandatory sentencing guideline regime bases its decision on facts (other than a prior conviction) not found by a jury beyond a reasonable doubt or admitted by the defendant, to enhance a defendant's sentence above the minimum required by the finding of guilty for a given offense. Booker, 543 U.S. at 244, 125 S.Ct. 738. Such error occurred when these defendants were initially sentenced in 1999, but we are of opinion it was cured on remand in 2005. In its order denying the defendants' motions to vacate the sentences and for resentencing, the district court (Judge Faber) announced that it had "reconsidered . . . [the] original sentences in these cases in light of Booker" and found the terms "to be reasonable and fully supported by credible evidence." (S.J.A.390) The district court then declared its intention, if called upon, to resentence "these defendants" in an identical fashion: "if called upon, . . . the court would give them the same sentence Judge Haden imposed." (S.J.A.390-91) We find that this language is, for all practical purposes, an "alternative identical sentence treating the Guidelines as advisory only." See United States v. Revels, 455 F.3d 448, 451 (4th Cir.2006); see United States v. Hammoud, 381 F.3d 316, 353-54 (4th Cir.2004). We therefore conclude that any Booker error in the defendants' sentencing is harmless, as it has not "actually affected the outcome of the proceedings." United States v. Hughes, 401 F.3d 540, 548 (4th Cir.2005).
 
 
 77
 To recount, the district court (Judge Haden) imposed on Calvin Dyess a life sentence based on sentencing hearing testimony, not before the jury or admitted by Dyess, that related to total drug amounts involved in the conspiracy (J.A. 745-46), proximity of firearms to the drug activity (J.A. 755), Calvin Dyess's attempts to obstruct justice (J.A. 754), and his organizing role in the drug distribution (J.A. 755). None of the these facts had previously been admitted to by Calvin Dyess. Based on this evidence, the district court found Calvin Dyess's base offense level to be 38, in that his drug activity involved at least 1.5 kg of crack cocaine (J.A. 744, 746-47). U.S.S.G. § 2D1.1(c) (1998). The court further applied three enhancements to determine the defendant's sentence: two levels for the presence of firearms under § 2D1.1(b)(1), four levels for a leadership role in the conspiracy under § 3B1.1(a), and two levels for obstruction of justice according to § 3C1.1. (J.A. 755) With a 46 offense level and a criminal history category of III, Calvin Dyess was sentenced to life. (J.A. 756)
 
 
 78
 As for Spencer, the district court imposed a prison term of 262 months based on testimony at the sentencing hearing regarding the total amount of drugs involved in the conspiracy (J.A. 727, 737) and Spencer's supervisory role in the distribution scheme. (J.A. 726) The district court found Spencer's base offense level to be 38, in that the drugs in question amounted to at least 1.5 kg of crack cocaine (J.A. 727, 730). U.S.S.G. § 2D1.1(c) (1998). Over the defendant's objection, the court further applied a three-level enhancement to Spencer's sentence after finding that Spencer occupied a managerial role in the conspiracy under § 3B1.1(b). (J.A. 726) The court did, however, grant the defendant's request for a three-level downward adjustment for accepting responsibility under § 3E1.1. (J.A. 729-30) With the enhancement and adjustment effectively cancelling out each other, the court found Spencer had an offense level of 38 and a criminal history category of II. (J.A. 730) The Guideline's Sentencing Table provided a sentencing range of 262 to 327 months, and the district court chose to sentence the defendant to the lowest end of the range at 262 months. (J.A. 730, 738) As was the case with Calvin Dyess, the district court's factual findings that served as bases for Spencer's sentence were not admitted by Spencer.
 
 
 79
 In considering Orange Dyess's sentence, the district court ordered him to serve 235 months of imprisonment based on testimony at the sentencing hearing relating to the amount and types of drugs located at his residence. (J.A. 709-10, 713-14) The court adopted the conclusions in Orange Dyess's presentence report, finding that the defendant controlled 882.72 g of crack, 100 g of cocaine, and 2.26 kg of marijuana (or the equivalent of 17,676.66 kg in marijuana) on his premises. (J.A. 709, 850-51) According to U.S.S.G. §§ 2D1.8(a)(1) and 2D1.1, this finding translated into a base offense level of 36 under U.S.S.G. § 2D1.1(c)(2). (J.A. 709) The court also applied a two-level enhancement for the presence of firearms in Orange Dyess's residence. (J.A. 709) With an offense level of 38 and a criminal history of I, Orange Dyess was eligible for a sentence of 235 to 293 months. (J.A. 710) However, because 21 U.S.C. § 856(b) provided for a maximum sentence of 20 years, the court could not sentence the defendant to more than 240 months. (J.A. 710) The district court imposed a term of imprisonment of 235 months. (J.A. 714) Similar to its computation for Calvin Dyess and Spencer, the district court computed Orange Dyess's sentence based on its own factual findings not previously admitted by the defendant.
 
 
 80
 On remand by this court, following disclosure of the Hart-Ursala affair, the district court conducted an evidentiary hearing which inquired into the factual background of the Hart-Ursala misconduct and its impact on the witnesses' testimony at the sentencing hearing. The court also examined a voluminous record that consisted of the government's series of disclosures, presentence investigation reports, and the record from the defendants' sentencing hearing. (S.J.A.382) The court also conducted an in camera examination of grand jury transcripts of testimony from Miss Rader, Hart, and Henderson. (S.J.A.382) From this body of information, the court concluded that "there is ample testimony in the record that has not been contradicted to support the original sentences." (S.J.A.390) Consequently, the district court denied the defendants' motions to vacate their sentences and for resentencing, deciding that the terms of imprisonment "are supported by abundant credible evidence." (S.J.A.390) In its order, the district court (Judge Faber) simultaneously considered the impact of Booker on the sentences and declared it would, if called upon, "give them the same sentences," Judge Haden imposed. (S.J.A.390-91)
 
 
 81
 We find the district court's language on remand to be analogous to an alternative identical sentence announced under an advisory sentencing scheme and approved in Hammoud, 381 F.3d at 353-54, and in Revels, 455 F.3d at 451-52. As in Revels, any further proceeding designed to correct the Booker error in the sentences would be "little more than an empty formality, for the sentence the district court would impose on remand is a foregone conclusion." Revels, 455 F.3d at 452. At the conclusion of the most recent evidentiary hearing in this case, the district court (Judge Faber) possessed as much or more reliable information about the defendants and the details of their offenses as had the sentencing court (Judge Haden). The district court was thus entitled to conclude that the sentences were reasonable and justified by abundant proof. We therefore decide that the defendants are not entitled to resentencing under Booker despite the Sixth Amendment error, or otherwise, as the defendants' sentences were not "longer than that to which [they] would otherwise be subject." Hughes, 401 F.3d at 548.
 
 VIII.
 
 82
 The defendants argue that the original sentences imposed by Judge Hayden are not supported by sufficient evidence, in that they are tainted by Miss Rader and Hart's misconduct that culminated in Hart's subornation of perjury by Miss Rader at the sentencing hearing. We have already addressed the substance of this question in our discussion of Booker and the impact on the defendants' sentences of the Ursula-Hart affair. On remand, Judge Faber considered anew all of the evidence justifying the defendants' sentences and found that "in spite of the credibility problems of Rader, Hart, Henderson, and Green, the original sentences are supported by abundant credible evidence." (S.J.A.390) We agree with the district court and find the defendants' contentions on this point to be without merit.
 
 IX.
 
 83
 Calvin Dyess contends that his offenses for money laundering and drug distribution should have been grouped pursuant to U.S.S.G. § 3D1.2(c) and our holding in United States v. Bartley, 230 F.3d 667, 673 (4th Cir.2000). The probation officer who prepared Calvin Dyess's presentencing report reasoned that the two offenses should not be grouped according to U.S.S.G. § 3D1.1(a)(3), in that each offense represented a different societal harm. (J.A. 894) At sentencing, the district court adopted the report's conclusions, finding that, in any case, grouping the offenses would not impact Calvin Dyess's sentencing, as "[t]he range is so much significantly higher in the drug conspiracy than it is with the money laundering conspiracy that I don't believe it bears further analysis." (J.A. 755-56) In response, defense counsel for Calvin Dyess conceded it was "not necessary" for the court to address the issue further. (J.A. 756) In its objections to the presentence report and at the sentencing hearing, the government expressed no opinion as to whether Calvin Dyess's offenses should be grouped for sentencing purposes.
 
 
 84
 On August 27, 1999, in the first sentence imposed on Calvin Dyess, Judge Hayden sentenced the defendant to life for both the drug count and the money laundering count according to a total offense level of 46. (J.A. 761-65) However, on August 31, 1999, only four days later, Judge Hayden issued an order under Criminal Rule 35(c) for technical error that corrected the August 27th judgment to provide that the life sentence was imposed solely for Count 2, the drug conspiracy conviction, and related that Count 3, the money laundering count, would be the subject of a separate judgment. (J.A. 766-67) On September 1, 1999, Judge Hayden issued a supplemental judgment to the initial judgment, wherein he sentenced Calvin Dyess to 108 months for the money laundering count according to a total offense level of 27. The 108-month sentence was to run concurrently with the life sentence. (J.A. 768-73)
 
 
 85
 In its brief, the government agrees that the district court erred in failing to group Calvin Dyess's offenses, yet maintains that such error is harmless because "the failure to group did not result in any increase in the defendant's adjusted offense level." (Br.49-50) We construe Calvin Dyess's brief to admit that the district court's decision not to group the offenses "did not ultimately affect his sentence." (Appellant Br. 68-73 and n. 17) We thus conclude that Calvin Dyess conditions his request for relief as to request grouping only if this court orders his resentencing. Because we affirm Calvin Dyess's sentence as previously imposed for the drug conviction, as well as for money laundering, we do not remand the case for resentencing. Thus, we do not group the offenses for sentencing.
 
 
 86
 The judgment of the district court in each case is accordingly
 
 
 87
 
 AFFIRMED.
 
 
 
 
 Notes:
 
 
 [1]
 Miss Rader filed for divorce from Calvin Dyess shortly after their arrests
 
 
 [2]
 We have already decided the case ofUnited States v. Bartram, 407 F.3d 307 (4th Cir. 2005), involving a co-conspirator of these defendants who was not materially affected by the government disclosures of the affair between Hart and Miss Rader.
 
 
 [3]
 On appeal, the defendants also now object to their sentences based onUnited States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).
 
 
 [4]
 The notation J.A. refers to the three-volume Joint Appendix filed in 1999, while S.J.A. refers to the Supplemental Joint Appendix filed in 2005
 
 
 [5]
 Miss Rader and Orange Dyess were released on bond, while Calvin Dyess and Spencer remained in government custody
 
 
 [6]
 Henderson, a partner of Hart on the Drug Team, has since admitted that such a payment was inconsistent with established Drug Team procedures
 
 
 [7]
 According to the report, Calvin Dyess conversed with Hart and referred to possible plans by third parties to harm Hart's young son. Calvin Dyess also discouraged Miss Rader from talking to law enforcement and intimidated another co-defendant who was cooperating with investigators
 
 
 [8]
 In January of 1998, authorities searched an apartment where Calvin Dyess once resided. Firearms, drugs, and other effects belonging to Calvin Dyess were recovered during the search
 
 
 [9]
 In July of 2001, Hart and Miss Rader married. (S.J.A.421) However, due to Hart's abusive tendencies, Miss Rader initiated divorce proceedings in November of the same year. (S.J.A.421) In December of 2001, with the assistance of counsel, Rader disclosed to the government the details of her relationship with Hart. (S.J.A.429)
 
 
 [10]
 The district court pointed out that no information had come to light to suggest federal prosecutors had engaged in misconduct. The court's decision was instead motivated by the possibility of the lead prosecutor being a potential witness in later proceedings, as well as a desire to avoid the appearance of impropriety
 
 
 [11]
 Judge Haden died March 20, 2004. The record does not show that he had seen the grand jury testimony
 
 
 [12]
 Hart likewise denied the affidavits' accusations
 
 
 [13]
 As noted, Judge Haden, who had conducted the proceedings until that time, died on March 20, 2004. Judge Faber, the Chief Judge of that court, conducted the case thereafter
 
 
 [14]
 Though the defendants attempted to call Hart as a witness at the evidentiary hearing, Hart exercised his right under the Fifth Amendment not to testify. On June 15, 2005, Hart pleaded guilty to a single count of making an unauthorized conveyance of money of the United States not in excess of $1000.00 to another person, in violation of 18 U.S.C. § 641
 
 
 [15]
 Defendant Spencer does not join in this portion of the appeal
 
 
 [16]
 Later in the plea hearing, the defendant again contested the definition of the charge, yet ultimately admitted his guilt:
 Q. So if the government had to at a trial prove this charge against you, it would have to prove the following elements by proof beyond a reasonable doubt. And that is, first, that you did knowingly maintain a place for the distribution or possession with intent to distribute a controlled substance....
 And, secondly, you — that it was used for that purpose and that you used it knowingly and intentionally.
 A. This was said to me another way, Your Honor. Now, I have had people come there, I have explained this, but willingly and use knowingly that I have known that people have smoked there. But as far as me establishing this for a crack house, that's — no, that's not correct.
 I did sign these papers stating that, but I was under the impression that I did know that people had came into my house at one time or smoked, or I did know that they had brought crack cocaine there. But me willfully setting up —
 Q. That's willfully if you allowed that to happen at your residence.
 A. But willfully opening, that's what I'm talking about, willfully opening. That's right, I saw them smoke there.
 Q. Did you understand that allowing people to come to this residence —
 A. Your Honor —
 Q. — to use and to sell crack cocaine would be a violation of federal and state drug laws?
 A. Yes, yes.
 Q. And before one can be guilty criminally, that person had to act knowingly and that is voluntarily —
 A. Yeah.
 Q. — and intentionally and not because of mistake or accident or negligence or some innocent reason on your part. So in other words, what I am saying, you cannot be guilty of this unless you knew what you were doing was wrong and allowed it to happen. Do you understand that?
 A. I understand what you are saying.
 Q. Do you consider yourself to be guilty of this offense?
 A. Yes.
 As demonstrated by this exchange, the defendant admitted to conduct that is included in the definition of the offense: "Knowingly open or maintain any place for the purpose of . . . using any controlled substance." 21 U.S.C. § 856(a)(1). Cf. United States v. Willis, 992 F.2d 489, 491 (4th Cir.1993) (by pleading guilty to using firearm in connection with drug crime, defendant forfeited right to contest statutory definition of "firearm"). Orange Dyess's efforts to parse statutory language during the hearing do not prove by implication or otherwise that his attorney failed to adequately explain the charge.
 
 
 
 88
 GREGORY, Circuit Judge, dissenting in part and concurring in part:
 
 
 89
 This appeal involves a flagrant instance of government misconduct in which the detective handling Calvin Dyess's drug investigation seduced his wife, Ursala Dyess, and encouraged her to lie about critical facts regarding Calvin and his co-defendants' culpability during the consolidated sentencing hearing. Further still, the detective permitted Ursala to keep some of the drug proceeds retrieved from Calvin's backyard. In addition to this wrongdoing, another witness admitted she lied during the grand jury hearing, while still another witness testified during the sentencing hearing, recanted his testimony, and finally recanted his recantation.
 
 
 90
 These revelations came to light while the defendants' sentences were on direct appeal to this Court. After we remanded the matter to Judge Haden, the district court judge who had originally sentenced defendants, to conduct further proceedings in light of this misconduct, the Supreme Court handed down its decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2004). However, Judge Haden passed away before fully reconsidering the sentences, and the matter was transferred to Judge Faber.
 
 
 91
 Despite the obviously sensitive nature of these proceedings and Booker's instruction to consider the Guidelines in connection with the sentencing factors set forth in 18 U.S.C. § 3553(a), id. at 259, 125 S.Ct. 738, Judge Faber did not conduct a de novo sentencing hearing. Instead, he conducted a limited sentencing hearing designed solely to address the degree to which Ursala Dyess and Detective Hart had tainted the other witnesses.
 
 
 92
 Despite the perjury that occurred at the initial sentencing hearing and the Booker errors arising from the original sentences imposed, the majority nonetheless concludes that the defects were harmless in light of the district court judge's subsequent findings of fact. I disagree. Judge Faber's sentencing hearing could not and did not cure the errors. Thus, I dissent from the majority's decision to affirm the sentences, as set forth in Parts VII and VIII of the opinion.
 
 
 93
 The district court judge explicitly stated that the sole purpose for the evidentiary hearing following remand from this Court "was to determine whether the alleged misconduct by Hart, Henderson, Rader [Ursula Dyess], or the purported recantations of Green and Cummings undermine the factual basis for the original sentencing guideline calculations in the defendants' cases." S.J.A. 381. Following the hearing, the judge concluded that: (1) any deficiencies in Ursula Dyess's testimony were harmless in light of other testimony supporting well over 1.5 kilograms of cocaine activity by Calvin Dyess; (2) there was no evidence that Detective Hart compromised or tainted the testimony of witnesses other than Ursala Dyess at the original sentencings; (3) Green's recantation of his testimony at the sentencing hearing was later recanted; and (4) Cummings's perjury at the grand jury proceeding was harmless because she did not testify at the sentencing hearing. Thus, the district court judge concluded that "in spite of the credibility problems of Rader, Hart, Henderson, and Green, the original sentences are supported by abundant credible evidence." S.J.A. 390.
 
 
 94
 The central flaw underlying this conclusion is that the district court judge was making after-the-fact credibility determinations. Instead, as the trier of fact, the judge on remand was obligated to make credibility determinations in the first instance. Here the judge considered solely the extent to which Ursala Dyess, Lori Nicole Cummings, Benjamin Green, Trooper Henderson, and Detective Hart had perjured themselves, without considering the critical question of whether the testimony proffered by the remaining witnesses regarding the attributable drug quantities and relevant conduct for each defendant was credible.
 
 
 95
 Importantly, saying that the perjury of a few witnesses did not taint the remaining witnesses is not the same thing as saying that the remaining witnesses were credible. By attempting to rehabilitate Judge Haden's findings by relying on a transcript of the sentencing hearing — without the benefit of seeing or hearing the key witnesses — the district court judge essentially acted as an appellate court engaging in a sufficiency of the evidence analysis. See United States v. Burgos, 94 F.3d 849, 863 n. 5 (4th Cir.1996) ("[T]he appellate function is not to determine whether the reviewing court is convinced of guilt beyond reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, `whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt.'" (internal citations omitted)). As the sentencing judge, a district court judge is in the best position to assess credibility, observe the demeanor of witnesses, resolve conflicting evidence, and determine the weight of the evidence. As appellate court judges, we necessarily depend on sentencing judges to make such fact-based determinations.
 
 
 96
 By not making these findings, the district court judge could not determine whether, after setting aside the tainted testimony, the evidence supported the drug quantities found and enhancements imposed by a preponderance of the evidence. On remand the district court judge was not entitled to rely on Judge Haden's generalized findings of fact, which did not identify and evaluate individually the various witnesses who testified at the sentencing hearing. Judge Haden did not know at the time of sentencing that some witnesses had perjured themselves, and he made no specific credibility findings regarding the remaining witnesses. Judge Faber did not see the testimony of the remaining witnesses given and had no basis (beyond that which we, too, have as an appellate court) to evaluate its credibility. As a result, we have no way of knowing whether the testimony proffered by the remaining witnesses, untainted by Detective Hart's egregious misconduct, could meet the government's burden with respect to the challenged drug quantities and enhancements. It is quite likely that Judge Haden's findings of fact rested on the perjured testimony of Ursala Dyess and the questionable testimony proffered by Detective Hart, Trooper Henderson, and Benjamin Green. The government has failed to show that those findings of fact — and the sentences they justified — safely can rest on the testimony of the remaining witnesses instead.
 
 
 97
 Furthermore, the limited nature of the district court judge's sentencing hearing foreclosed proper consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). Reconsidering the sentences following remand from this Court and Judge Haden's death, the district court judge stated:
 
 
 98
 The court delayed ruling on these motions pending decision by the United States Supreme Court of [sic] United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The court has reconsidered Judge Haden's sentences in these cases in light of Booker and finds them to be reasonable and fully supported by credible evidence. In light of this evidence, if called upon to resentence these defendants, the court would give them the same sentences Judge Haden imposed.
 
 
 99
 S.J.A. 390-91 (emphasis added).
 
 
 100
 Although a district court's consideration of an alternative sentence under Booker could normally cure a Booker error, the district court judge's curtailed hearing could not and did not cure the Booker errors in Judge Haden's original sentences.* Given the limited purpose of the sentencing hearing on remand, the district court judge did not hear any evidence regarding the factors set forth in § 3553(a). As a result, he could not have made any of the factual findings required under Booker, such as: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and (3) the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a); see United States v. Green, 436 F.3d 449, 455 (4th Cir.2006) ("[T]he court must make factual findings, as appropriate or necessary to carry out its sentencing function, and in every case give the reasons for the sentence imposed, as well as reasons for particular deviations from the Sentencing Guidelines." (citing 18 U.S.C. § 3553(c))). Thus, without hearing any evidence relevant to sentencing and making his own findings by a preponderance of the evidence, the district court could not fulfill its duty to consider the § 3553(a) factors in accordance with our post-Booker precedent. See United States v. Hughes, 401 F.3d 540, 546 (4th Cir.2005) ("[T]he court shall consider [the Guidelines] range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence."). Because the district court judge did not implement the post-Booker remedy by fully considering the § 3553(a) factors, the Booker errors stemming from the sentences cannot be deemed harmless.
 
 
 101
 As a result, the sentences suffer from two significant defects: (1) the strong likelihood that the underlying findings of fact rested on tainted testimony; and (2) Sixth Amendment error that was not remedied by the district court's incomplete consideration of the factors set forth in § 3553(a). A de novo sentencing hearing could have eliminated the overwhelming appearance of impropriety that unfortunately has hung over these proceedings. Now we are left with sentences that may well have rested on tainted evidence.
 
 
 102
 For these reasons, I cannot join the majority in affirming these sentences. I would vacate the sentences and remand for resentencing.
 
 
 
 Notes:
 
 
 *
 As the majority acknowledges, Orange Dyess did not admit to any specific drug quantities. Nevertheless, Orange Dyess was subject to a base offense level of 36 and a 2-level enhancement for the presence of a firearm during the offense and received a sentence of 235 months. Without judicial factfinding, Orange Dyess would be subject to a total offense level of 6 and criminal history category of I — a sentencing range of 0-6 months, which is far less than the 235 months he received
 Similarly, Eric Spencer received a 3-level enhancement for his leadership role in the offense. Without the enhancement, he would have received a sentencing range of 188-235 months, which was less than the 262 months he received.
 Finally, Calvin Dyess received a 2-level enhancement for the presence of firearms, a 4-level enhancement for his leadership role in the offense, and a 2-level enhancement for obstruction of justice. Without those enhancements, Calvin Dyess would have been subject to a sentencing range of 210-262 months, which is less than the life imprisonment he received.