# COURT OF APPEALS OF VIRGINIA

―――――――――

### Record No. 1417-24-2

―――――――――

RAYSHAWN SCOTT

v.

COMMONWEALTH OF VIRGINIA

―――――――――

Present: Judges Beales, O'Brien and Ortiz

Argued at Richmond, Virginia

Opinion Issued June 2, 2026

―――――――――

### FROM THE CIRCUIT COURT OF THE CITY OF PETERSBURG
Joseph M. Teefey, Jr., Judge

Sante J. Piracci (Sante J. Piracci P.C., on brief), for appellant.

William K. Hamilton, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

―――――――――

### PUBLISHED OPINION BY
### JUDGE DANIEL E. ORTIZ

INTRODUCTION

A *Brady*[2] violation offends the constitutional guarantee of due process, but it speaks to the fairness of the proceeding rather than the defendant's guilt or innocence. Accordingly, the appropriate remedy is one tailored to cure prejudice flowing from the violation—and absent a showing of irreparable harm or a pattern of endemic prosecutorial misconduct, dismissal is not appropriate.

A *Brady* found Rayshawn Scott ("Scott") guilty of seven charges related to a shooting. Upon learning that the Commonwealth failed to produce *Brady* material, Scott filed a post-

―――――――――

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

conviction motion asking the court to either dismiss his case with prejudice or grant him a new trial with a special prosecutor. At retrial, a jury once again found Scott guilty of all charges. On appeal, Scott challenges the trial court's decision to grant a retrial rather than dismissal. He also argues that the trial court erred in finding that no conflict existed with the City of Petersburg Commonwealth's Attorney's Office. Finally, he contends that the trial court erred when it denied his motion to strike. Because retrial cured any lingering prejudice from the *Brady* violation, we affirm the trial court's decision denying the motion to dismiss. As Scott failed to present evidence of material conflict, the trial court did not err denying Scott's motion to disqualify the Petersburg Commonwealth's Attorney's Office. Finally, the Commonwealth presented sufficient evidence of identity to survive a motion to strike. Accordingly, we affirm the judgment of the trial court.

BACKGROUND[3]

On November 24, 2021, William Parham Jr. and Alphonse Whitfield were shot at Parham's home in the City of Petersburg. Parham died the next day from multiple gunshot wounds to his torso.

A. The Shooting[4]

On November 24, 2021, Shaquille Scott ("Shaquille") drove his cousin, Rayshawn Scott ("Scott") to Parham's house. Initially, Scott remained outside while Shaquille went in to "hang out." Once inside, Shaquille saw Parham, Paulette Day, and four other people whom he did not

---

[3] On appeal, this Court "review[s] the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323 (2018)). That principle requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Newsome v. Commonwealth*, 81 Va. App. 43, 51 (2024) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

[4] The facts as recited come from the second trial's record.

know. After Day knocked over Parham's food, Shaquille left with Day and drove her and Scott to buy more food. When they returned to Parham's house, Scott and Day went inside. Shaquille stayed in his car to FaceTime his girlfriend. Thirty or forty minutes later, Shaquille heard multiple gunshots and saw people fleeing Parham's house. Scott ran back to Shaquille's car, and they left. Shaquille testified that he did not see Scott with a gun, and he did not ask his cousin any questions, stating "where I am from, you don't ask questions."

Day testified that she was in Parham's kitchen before the shooting when she heard a man come down the steps and say "[a]ll y'all walk around with guns. Y'all don't fight no more." She did not see the shooter, but she heard shots and saw Parham and Whitfield injured on the floor. Day left the house and did not call the police. She testified that she was "high" during the shooting and, at first, said she did not remember if anyone had a gun. When asked by the prosecutor if she recalled telling the police that she saw Scott with a gun she said "yes," she saw the defendant, "Ray Ray," with a gun.

The night of the shooting, Dashandra Brown, a friend of Scott's ex-girlfriend Myeshia Harrison,[5] received a Facebook message from Scott asking if she could call him "right quick." Brown called, and Scott told her that she needed "to reach out to [her] friend [Harrison] to let her know she need[ed] to report her gun stolen because he just did something crazy." Brown called Harrison and "relayed the message to her." Then, she called Scott back to confirm that it was done.

During their investigation, the police recovered six spent .380 cartridge cases outside of Parham's home, three expended .380 bullets inside, and later recovered a fourth .380 bullet from

---

[5] At trial, Harrison testified that she purchased a .380 Smith & Wesson handgun while in a relationship with Scott. Later, the two broke up. A fight ensued, and Scott "trashed" Harrison's house. A few days later, Harrison realized that her handgun was missing. While she did not see Scott take the gun, she noticed it went missing after he left her house.

- 3 -

Parham's right leg. Forensic analysis revealed that the six cartridge cases had been expelled from the same gun. Testing also revealed that the four bullets were expelled from the same firearm.

A month after the shooting, the police interviewed Scott. During the interview, Scott claimed he was not at Parham's house at the time of the shooting. Police arrested Scott shortly after the interview.

B. Procedural History

On March 10, 2023, a jury found Scott guilty of second-degree murder (Code § 18.2-32), use of a firearm in the commission of murder or attempted murder (Code § 18.2-53.1), aggravated malicious wounding (Code § 18.2-51.2), use of a firearm in the commission of an aggravated malicious wounding or attempted aggravated malicious wounding (Code § 18.2-53.1), maliciously shooting at an occupied building (Code § 18.2-279), unlawfully wounding another while committing or attempting to commit a felony (Code § 18.2-53), and willfully discharging a firearm in a public place resulting in bodily injury (Code § 18.2-280).

Before sentencing, Scott filed a "Motion for Dismissal with Prejudice, a New Trial or for Other Relief Pursuant to a *Brady* Violation" and a "Motion for the Court to Disqualify the Petersburg Commonwealth's Attorney and Appoint a Special Prosecutor." Scott argued that the prosecutor, Senior Assistant Commonwealth's Attorney Joseph Lee ("Lee"), had violated his *Brady* and *Giglio*[6] obligations by failing to disclose an agreement between the Commonwealth and Shaquille. Scott asserted that Lee promised to reduce Shaquille's then-pending felony possession of drugs with the intent to distribute charge to a misdemeanor paraphernalia charge in exchange for Shaquille's testimony. Scott noted that the Commonwealth's original witnesses list, filed January 2023, did not include Shaquille. One day before trial, Lee sent defense counsel

---

[6] *Giglio v. United States*, 405 U.S. 150 (1972).

an amended witness list adding Shaquille. As to his motion to disqualify, Scott argued that the court should disqualify the entire Petersburg Commonwealth's Attorney's Office because it was "not unreasonable to suppose" that Lee had been "ineffectively supervised" and the office had not taken "affirmative steps to either disclose [the agreement] or to ameliorate the violation."

In August 2023, the trial court held an evidentiary hearing on the motions. Scott presented several witnesses. First, Elsa Seidel, Shaquille's attorney, testified that on March 6, 2023, she was in court for a preliminary hearing on Shaquille's pending charges when Lee, the prosecutor in court that day, spoke with her about Shaquille testifying against Scott in exchange for a reduced charge. Seidel brought the offer to Shaquille, who was reluctant to testify, but ultimately agreed because "it was the right thing to do" and he was "hoping to get the benefit" of a reduced charge. Shaquille confirmed that he testified, in part, for the reduced charge.

Next, Ashley Henderson, a Deputy Commonwealth's Attorney in the City of Colonial Heights, testified that at some point after March 10, 2023, her office was appointed as special prosecutor to handle Shaquille's case. Henderson's office learned from Seidel that there was an agreement in Shaquille's case. On March 23, Henderson called Lee to ask about the agreement, and Lee confirmed that "it was to reduce [the charge] to paraphernalia." Henderson "was shocked because that is what Ms. Seidel had also indicated the agreement was." She "expressed concern that [her office] had been appointed to a case . . . where a deal had already been worked out, and therefore, [she] was bound by that agreement."

When Henderson asked Lee why her office had been appointed to the case if Shaquille had already testified, Lee said that Tiffany Buckner, the City of Petersburg Commonwealth's Attorney, made the decision. Henderson requested to speak to Buckner, and Lee asked "if there was a problem." Henderson expressed concern that "there was an agreement that [her office] was bound to" and she "had not been notified about the agreement." Lee said "that the

agreement was not in writing," and Henderson replied, "it doesn't matter whether it's in writing or not. It's an agreement."

On April 21, 2023, Henderson and her office learned that defense counsel for Scott had no knowledge of the agreement. Two days later, the City of Colonial Heights prosecutor moved to withdraw as special prosecutor in Shaquille's case. The motion raised concerns about working on a case with seemingly no conflict and being "bound by an agreement that [their] office did not negotiate" and one that had "not be[en] disclos[ed] to all parties." Following the City of Colonial Heights's withdrawal from the case, Lee dropped all pending charges against Shaquille on June 26, 2023.

Buckner testified on behalf of the Commonwealth. She stated that she spoke with Lee in February 2023 about Shaquille's case but did not believe there was a conflict because Lee "didn't expect to be able to use [Shaquille] at all" in Scott's case. After Shaquille testified, Buckner made the decision to request a special prosecutor. When the City of Colonial Heights raised concerns about the appointment, Buckner instructed Lee to speak with the State Bar. She also reviewed Shaquille's files and found no evidence of a written agreement or offer.

During the hearing, the trial court asked Scott's attorney how to remedy the alleged *Brady* violation. Scott's attorney replied, "I'd ask for a dismissal with prejudice, Judge. That's one of the remedies I have set out." Recognizing that dismissal was an extreme request, defense counsel also stated that he "d[idn't] think it would be inappropriate to ask for a new trial."

After taking the matter under advisement, the trial court denied Scott's motion for dismissal and motion for disqualification, but vacated Scott's conviction and granted his motion for a new trial. The court reasoned that Shaquille agreed to testify in exchange for the reduced charge, and the Commonwealth's failure to disclose that agreement was a *Brady* violation that was materially prejudicial to Scott because Shaquille was the only witness to place the defendant

- 6 -

at the scene of the crime.[7]  The court noted that "a jury could have discounted or disregarded [Shaquille's] testimony had it been aware of his agreement with the Commonwealth."  But the court further found that the City of Petersburg's Commonwealth's Attorney "did nothing purposefully wrong or that would constitute an ethical violation."

Buckner prosecuted the second trial, and Lee did not participate.  After the Commonwealth rested, Scott moved to strike, arguing that the evidence was insufficient to prove the identity of the shooter because there were other people present at Parham's home, and nobody observed the shooting.  The trial court granted the motion in part, reducing the aggravated malicious wounding charge and accompanying firearm charge to malicious wounding and use of a firearm in the commission of malicious wounding, but denied the motion as to the other charges.  The jury found Scott guilty, and the trial court sentenced him to 76 years' incarceration with 50 years suspended.  Scott appealed.

ANALYSIS

I. The trial court did not abuse its discretion by denying Scott's motion to dismiss and instead ordering a new trial.

"The remedial relief to be granted by the trial court following a discovery violation or upon the late disclosure of evidence is within the trial court's discretion and will not be disturbed on appeal unless plainly wrong."  *Moreno v. Commonwealth*, 10 Va. App. 408, 420 (1990).  "In evaluating whether a trial court abused its discretion, . . . 'we do not substitute our judgment for that of the trial court.  Rather, we consider only whether the record fairly supports the trial court's action.'"  *Carter v. Commonwealth*, 293 Va. 537, 543 (2017) (alteration in original) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

---

[7] Paulette Day did not testify at the first trial.  The Commonwealth called her as a witness during the retrial.

On appeal, Scott argues that the trial court abused its discretion by refusing to dismiss the charges with prejudice. Scott contends that dismissal is appropriate when prosecutors intentionally deprive a defendant of a fair trial. While we find Lee's failure to disclose impeachment evidence deeply troubling, we disagree.[8] Dismissal is appropriate only when the *Brady* violation causes irreparable prejudice to the defendant, or the record supports a finding of egregious and pervasive prosecutorial misconduct. *See, e.g.*, *United States v. Dyess*, 478 F.3d. 224, 236 (4th Cir. 2007) (affirming trial court's denial of defendant's motion to dismiss after a prosecutor induced a witness to commit perjury because retrial would cure prejudice); *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994) (remanding with order to dismiss indictment after the government destroyed potentially exculpatory evidence in the face of defense's repeated requests for pretrial access to the evidence). As neither scenario is present here, the trial court acted within its discretion by refusing dismissal.

Because *Brady* violations involve "the constitutional disclosure obligations of the prosecution — not the guilt or innocence of the defendant . . . the proper remedy for a proven violation includes a continuance, a mistrial, or some lesser remedy." *Romero v. Commonwealth*, No. 0050-13-4, slip op. at 27 (Va. Ct. App. Mar. 25, 2014).[9] In fact, no Virginia appellate court

---

[8] We are aware of conflicting findings regarding the intentionality of Lee's failure to disclose the agreement with Shaquille. The trial court found that nobody "did anything purposefully wrong in this case." Scott did not challenge the trial court's factual findings on appeal. However, we take judicial notice under Virginia Rule of Evidence 2:201(a), that while this case was pending before us, Lee faced bar disciplinary action for his conduct in Scott's first trial. In March 2026, the Supreme Court affirmed the finding of a three-judge panel that Lee "knowingly failed to disclose [the] agreement" and that Lee violated the Virginia Rules of Professional Conduct, and it upheld a two-year suspension of his bar license. *See Lee v. Va. State Bar ex rel. Third Dist.*, ___ Va. ___ (Mar. 19, 2026). Because the intentionality of a *Brady* violation, by itself, does not compel dismissal of charges, we need not grapple with these conflicting factual findings.

[9] While not binding, unpublished cases may be cited as persuasive authority. Rule 5A:1(f); *Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023).

has ever dismissed an indictment when the prosecutor failed to disclose *Brady* material. *See, e.g.*, *Bly v. Commonwealth*, 280 Va. 656, 664 (2010) (remanding "for a new trial" in light of *Brady* violation); *Workman v. Commonwealth*, 272 Va. 633, 651 (2006) (ordering "a new trial because of *Brady* violations"). Indeed, our federal counterparts have found that "dismissal is appropriate only as a last resort, where no other remedy would cure prejudice against a defendant." *United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015). For example, if "evidence that is central to the case" is lost or destroyed, it "may permanently deprive the defendant of due process" and cause prejudice that a retrial cannot cure. *Bohl*, 25 F.3d at 914.

Courts have not entirely foreclosed the possibility "that a pattern of prosecutorial misconduct could be so entrenched and pervasive that it would justify dismissal of indictments without a finding of prejudice to defendants." *United State v. Derrick*, 163 F.3d 799, 809 (4th Cir. 1998). But to warrant dismissal without demonstrating prejudice, the defendant "must show that the challenged conduct violates commonly accepted norms of fundamental fairness and is shocking to the universal sense of justice." *United States v. Guzman*, 282 F.3d 56, 59 (1st Cir. 2002). Even if such a situation exists, dismissal of an indictment does not necessarily follow if the conduct is "redressable through the utilization of less drastic disciplinary tools," *Derrick*, 163 F.3d at 809 (quoting *United States v. Santana*, 6 F.3d 1, 11 (1st Cir. 1993)), "including publicly chastising the attorneys and recommending them for disciplinary proceedings," *id.* at 810.

Scott has not demonstrated how the new trial failed to resolve prejudice from the *Brady* violation. The trial court held that the undisclosed agreement between Shaquille and Lee "was material in that the only witness to place the defendant at the scene of the crime was Shaquille Scott." The trial court noted that Shaquille's "credibility will be something that would have a great effect on the impact of the jury's determination of this case" because "[a] jury could have

discounted or disregarded [Shaquille's] testimony had it been aware of his agreement." The new trial cured this concern.

Here, the *Brady* material was not lost or destroyed so as to "permanently deprive the defendant of due process." *Bohl*, 25 F.3d at 914. Rather, Shaquille testified at the second trial, and defense counsel cross examined him about his agreement with the Commonwealth and the disposition of his previous drug charges. Consequently, the jury had the opportunity to evaluate Shaquille's testimony and discount or disregard it accordingly.[10]

At most, Scott argues that Lee's prosecutorial misconduct was so egregious that punitive action is required to deter similar conduct. Yet, a *Brady* remedy is not a tool used to punish the prosecution; it is one that safeguards the threshold requirements of the Due Process Clause. *See Commonwealth v. Tuma*, 285 Va. 629, 639 n.2 (2013) ("*Brady* is not a canon of prosecutorial ethics." (quoting *Tuma v. Commonwealth*, 60 Va. App. 273, 308 (2012) (Kelsey, J., dissenting))). The threat of professional sanctions is sufficient to protect due process interests in all but the most severe cases. Because Scott has not demonstrated a pattern of "entrenched" and "pervasive" prosecutorial misconduct, this is not one of those cases. *Derrick*, 163 F.3d at 809-10.

Even if the trial court had found that Lee acted in bad faith, "inadvertent nondisclosure has the same impact on the fairness of the proceeding as deliberate concealment." *Tuma*, 285 Va. at 639 n.2 (quoting *Strickler v. Greene*, 527 U.S. 263, 288 (1999)). *See also Brady v.*

---

[10] At oral argument, Scott asserted that the timing of the retrial was prejudicial because Shaquille already had the benefit of his bargain (the dismissal of charges) so, the jury may be less inclined to weigh the impact of the deal on Shaquille's testimony. Scott raises an interesting point; however, he did not present this theory below or address the issue on brief. Under settled principles, we "will not consider an argument on appeal which was not presented to the trial court." *Ohree v. Commonwealth*, 26 Va. App. 299, 308 (1998); Rule 5A:18. *See generally Doe v. Green*, 304 Va. 536, 545 & n.8 (2025) (recognizing that "an appellant's failure to raise a specific argument in her opening brief" and to cite supporting authorities waives that argument).

*Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process . . . irrespective of the good faith or bad faith of the prosecution."). Thus, the nature of the suppression by the prosecution does not impact the *Brady* remedy so long as the remedy cures any lingering prejudice. As noted above, the prejudice here stemmed from the suppression of impeachment evidence. Retrial gave Scott the opportunity to use the impeachment evidence to challenge Shaquille's credibility. Therefore, the trial court acted within its discretion when it declined to dismiss the charges and instead vacated the conviction and ordered a new trial.

A *Brady* violation infringes on a defendant's due process rights and sows doubt as to the fundamental fairness of a criminal proceeding. Recognizing that a *Brady* remedy is not a disciplinary sanction but rather one that safeguards the rights of the accused, the trial court denied Scott's motion to dismiss and instead ordered a new trial. Because the new trial cured any lingering prejudice, we affirm.

> II. The trial court did not abuse its discretion when it overruled Scott's motion to appoint a special prosecutor.

"[T]o protect prosecutorial impartiality, a trial court has the power to disqualify a Commonwealth's attorney from proceeding with a particular criminal prosecution if the trial court determines that the Commonwealth's attorney has an interest pertinent to a defendant's case that may conflict with the Commonwealth's attorney's official duties." *Lux v. Commonwealth*, 24 Va. App. 561, 568 (1997). "The decision whether to disqualify a Commonwealth's attorney in a particular case is committed to the sound discretion of the trial court." *Id.* at 569. Nevertheless, "whether a defendant's due process rights are violated . . . is a question of law, to which we apply a de novo standard of review." *Henderson v. Commonwealth*, 285 Va. 318, 329 (2013).

Scott contends that the trial court abused its discretion when it failed to disqualify the Petersburg Commonwealth's Attorney's Office and appoint a special prosecutor, because after a *Brady* violation, a prosecutor may be motivated to "do everything possible to redeem the prior guilty finding by securing a guilty verdict on the same charges." We disagree. A prosecutor's good faith desire to further justice by enforcing the law does not create a conflict of interest.

"The due process rights of a criminal defendant under both the Virginia and United States Constitutions are violated when a Commonwealth's Attorney who has a conflict of interest relevant to the defendant's case prosecutes the defendant." *Powell v. Commonwealth*, 267 Va. 107, 138 (2004). "[T]he burden is on the party seeking disqualification of the prosecutor to present evidence establishing the existence of disqualifying bias." *Id.* A trial court should grant a defendant's motion to disqualify "where it can be reasonably inferred that the Commonwealth's attorney has either a personal interest in the outcome of the prosecution or an interest arising from his or her former representation of the defendant that conflicts with the fair minded exercise of his or her prosecutorial discretion." *Lux*, 24 Va. App. at 569-70. The former occurs when "the prosecutor has some direct personal interest arising from a financial interest, kinship, or close friendship such that his objectivity and impartiality are called into question." *Powell*, 267 Va. at 138. The latter arises when a prosecutor had a previous attorney-client relationship with the defendant and "he obtained privileged information that may be adverse to the defendant's interest." *Id.*

Apart from these two types of direct conflict, there is a broader question of whether, "on the facts of a particular case, the adversarial nature of the judicial process has resulted in such enmity toward the defendant on the part of the prosecutor that it will overbear his professional judgment in seeking fairly and impartially to see justice done." *Id.* at 139. Due to the confrontational nature of criminal proceedings, the defendant must present evidence "that the

prosecutor is acting not within the dictates of the law, but has strayed outside those parameters in furtherance of a personal animus against the defendant." *Id.*

As a preliminary matter, both parties agree that Lee did not prosecute or participate in the retrial. So, any argument that the trial court erred by denying the motion to disqualify Lee is moot. Moreover, Scott failed to demonstrate that either type of direct conflict—personal interest or past representation—applied to the City of Petersburg Commonwealth's Attorney's Office. At best, Scott alleges that Lee, and thus the Commonwealth's office, intentionally concealed *Brady* material to secure a guilty verdict, and their desire to "redeem" their office and secure a second guilty verdict creates a material conflict. This is wrong for two reasons.

First, Scott presented no evidence that Lee's suppression of impeachment evidence stemmed from "personal animus against the defendant." There is no doubt that Lee breached his *Brady* obligations and violated Disciplinary Rule 3.8(d) by withholding exculpatory evidence, but this alone does not demonstrate animus. To hold otherwise, would turn every *Brady* violation, intentional or inadvertent, into a conflict of interest. Second, even if Lee had the type of "adversarial conflict" addressed in *Powell*, one attorney's conflict does not necessarily disqualify an entire prosecutor's office. *See Lux*, 24 Va. App. at 573 (refusing to adopt a per se rule disqualifying an entire Commonwealth's office in cases where one prosecutor has a conflict because he acted as a criminal defendant's former counsel). Whether a prosecutor's conflict justifies the disqualification of the entire Commonwealth's office "is a matter committed to the exercise of discretion by the trial court" and should be evaluated on a "case-by-case approach." *Id.*

Here, there is no evidence that Lee's alleged "adversarial conflict" rendered the entire office unable to prosecute the case fairly and impartially. Lee was the only prosecutor alleged to have withheld exculpatory evidence. Unrebutted testimony demonstrated that the deal between

- 13 -

Shaquille and the Commonwealth was negotiated by Lee alone. Additionally, there was no written memorialization of the agreement in the case files. Once the Commonwealth's Attorney learned of the potential *Brady* violation, she directed Lee to contact the State Bar. The record supports the trial court's finding that there was not "any sort of conflict that the Commonwealth has with this case" such that it required a special prosecutor. Accordingly, we hold that the trial court did not abuse its discretion by overruling Scott's motion to disqualify.

III. The trial court was not plainly wrong in denying Scott's motion to strike.

We review the trial court's denial of a motion to strike under familiar principles. In a jury trial, the court does "not err in denying [a] motion to strike the evidence [when] the Commonwealth present[s] a *prima facie* case for consideration by the fact finder." *Vay v. Commonwealth*, 67 Va. App. 236, 249 (2017) (alterations in original) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 657 (2015)). Accordingly, "[a] motion to strike challenges whether the evidence is sufficient to submit the case to the jury." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014). "What the elements of the offense are is a question of law that we review *de novo*. Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Vay*, 67 Va. App. at 249 (quoting *Linnon*, 287 Va. at 98). When reviewing the factual findings "we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Linnon*, 287 Va. at 98.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). But the Commonwealth is not required to carry its burden by direct evidence. *See Stamper v. Commonwealth*, 220 Va. 260, 272 (1979) ("Circumstantial evidence is as competent and is

entitled to as much weight as direct evidence, provided it is sufficiently convincing."). Rather, circumstantial evidence is sufficient to prove the identity of a criminal agent when "circumstances of time, place, motive, means, opportunity[,] and conduct concur in pointing out the accused as the perpetrator of the crime." *Schlimme v. Commonwealth*, 16 Va. App. 15, 18 (1993) (quoting *Potts v. Commonwealth*, 12 Va. App. 1093, 1097 (1991)).

Scott argues that the trial court erred when it denied his motion to strike because the Commonwealth failed to present "direct evidence that [Scott] committed an unlawful shooting" and the circumstantial evidence required the jury to speculate as to the shooter's identity. This argument misses the mark. Although no one witnessed Scott shoot Parham, the Commonwealth presented sufficient evidence of the shooter's identity to survive a motion to strike.

First, the Commonwealth demonstrated the circumstances of time and place. Both Shaquille and Day testified that Scott was at Parham's home the night of the shooting. Shaquille testified that Scott went inside thirty to forty minutes before he heard gunshots, and Day confirmed that Scott was inside when the shooting occurred. The Commonwealth also presented evidence of means and opportunity. The victim was shot multiple times and a bullet from a .380 firearm was recovered from his leg. The police found bullet casings from a .380 firearm outside of Parham's house. Harrison stated that she believed Scott stole her .380 Smith & Wesson just weeks before the shooting. Day testified that she saw Scott with a gun the night of the shooting. And there is nothing in the record indicating that another person had a gun that night.

Furthermore, Scott's conduct after the shooting points to his identity as the shooter. *See Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991) ("the fact of an accused's flight, escape from custody, resistance to arrest, concealment, . . . and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself" (quoting *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir. 1970))). Shaquille testified that after the gunshots went off, Scott fled

Parham's house and ran to Shaquille's car. Later, when the police interviewed Scott, he denied being present at Parham's house the night of the shooting. *See Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) ("[I]n drawing inferences from the evidence, the fact finder may conclude regarding *even a non-testifying defendant* that his false statements establish that he has lied to conceal his guilt." (emphasis added)). Additionally, the night of the shooting, Scott through a third party, requested that Harrison, the owner of the .380 Smith & Wesson, report the gun as stolen because he "did something crazy."

Taken together, the Commonwealth established sufficient circumstantial evidence of identity to survive a motion to strike. Thus, the trial court was not plainly wrong in denying Scott's motion to strike the evidence.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*